UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREGG RATCLIFF, PORSCHE HOLDER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00623-TWP-KMB |
| | ) | |
| TRANSTEWART TRUCKING INC., | ) | |
| CHEROKEE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BURRELL LEE, | ) | |
| | ) | |
| Interested Party. | ) | |

**ORDER GRANTING  DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND RULING ON CHEROKEE'S MOTION TO STRIKE SURREPLY**

This matter is before the Court on Motions for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants TranStewart Trucking Inc. ("TranStewart") (Filing No. 83) and Cherokee Insurance Company ("Cherokee") (Filing No. 86) (together, "Defendants"). Also before the Court is Cherokee's Motion to Strike Surreply (Filing No. 110). Plaintiffs Gregg Ratcliff ("Ratcliff") and Porsche Holder ("Holder") (together, "Plaintiffs") initiated this action after Interested Party Burrell Lee ("Lee"), collided into and injured both Ratcliff and Holder. In their Second Amended Complaint, (Filing No. 54), Plaintiffs allege that TranStewart is vicariously liable for Lee's negligence, and they seek a declaration that Cherokee is required to cover any damages TranStewart owes them. For the reasons discussed below, summary judgment is **granted** on behalf of TranStewart and Cherokee.

## I.     <u>BACKGROUND</u>

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Plaintiffs as the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

### A.     <u>TranStewart's Business and Orientation Process</u>

TranStewart is a ground transport company that uses semi-trucks, also called semi tractors, to transport cargo (Filing No. 84 at 2; Filing No. 95 at 2).  TranStewart does not actually own any trucks or employ any drivers; rather, it leases trucks from the trucks' owners, who either drive the trucks themselves or hire drivers (Filing No. 84 at 2; Filing No. 95 at 2). TranStewart pays only the owners who lease their trucks to TranStewart. If an owner hires a driver, then that owner, and not TranStewart, pays the driver (Filing No. 84 at 2, 4).

All prospective drivers for TranStewart must go through orientation at TranStewart's facility in Michigan, even if they have driven for TranStewart before. *Id.* at 2. The orientation process includes filling out an application, receiving instructions on procedures, drug and alcohol screening, and the procurement of insurance, license plates, and fuel cards, among other items (Filing No. 84 at 2–3; Filing No. 87 at 6). While the prospective drivers are in orientation, TranStewart inspects the trucks to ensure they comply with the Department of Transportation's and TranStewart's requirements.  If a truck does not pass inspection, "the whole process stops and does not move forward" (Filing No. 84 at 3).

### B.     <u>TranStewart's Relationship with Burrell Lee and Darrell Haston</u>

Lee is a professional truck driver with a commercial driver's license (Filing No. 95 at 1). He has been driving for decades and has driven for multiple trucking companies. *Id.* at 2. At one

point, Lee operated his own trucking company (Filing No. 95 at 13; Filing No. 97-1 at 18–22). Lee had leased his trucks and driven for TranStewart at least twice in the past: from May 30, 2019 to February 13, 2020; and from February 17, 2021 to December 21, 2021 (Filing No. 95 at 1). Lee stopped driving for TranStewart in February 2020 and December 2021 because his trucks began experiencing mechanical problems. *Id.*

In December 2021,[1] Lee had an in-person meeting with a TranStewart representative. The representative told Lee that TranStewart would try to find him another truck to drive. *Id.* at 2. In January 2022, TranStewart became aware that non-party Darrell Haston ("Haston") was looking to lease his truck but needed a driver (Filing No. 95 at 2–3; Filing No. 84 at 3). Jacob Turpin ("Turpin"), a TranStewart employee, informed Haston that Lee was available to lease and drive Haston's truck (Filing No. 84 at 3). TranStewart then provided Haston's contact information to Lee and encouraged Lee to contact Haston (Filing No. 95 at 3).

Lee contacted Haston, and the two men spoke on the telephone and later met at Haston's home (Filing No. 97-1 at 13; Filing No. 84 at 3). As a result of the meeting, Haston decided to let Lee drive his truck. TranStewart was not involved in Haston's decision to hire Lee as a driver (Filing No. 84 at 3; Filing No. 95 at 3). Lee understood that if TranStewart decided to lease Haston's truck, then TranStewart would pay only Haston, and Haston would pay Lee (Filing No. 84 at 4; Filing No. 95 at 5). Haston knew that before TranStewart would lease his truck, it would need to pass an inspection at TranStewart's Michigan facility (Filing No. 84 at 4).

---

[1] Plaintiffs' brief refers to Lee's truck breaking down in "December 2022," but based on the context of this statement and Lee's deposition transcript, it appears Plaintiffs meant to refer to December 2021, not 2022.

**C.**     **Lee's Trip to TranStewart's Facility**

TranStewart instructed Haston to have Lee drive the truck to Michigan, where TranStewart would inspect the truck and execute a lease (Filing No. 95 at 3). Haston permitted Lee to drive the truck to Michigan and gave Lee "about $500" for gas (Filing No. 84 at 4; Filing No. 95 at 3, 5).[2] TranStewart did not pay Lee for his trip to Michigan (Filing No. 95 at 5). Lee did not believe he was under TranStewart's control or dispatch during the drive to Michigan, but he believed he would be hired once he completed orientation and TranStewart executed a lease. *Id.* Lee decided to drive Haston's truck to Michigan because he wanted to continue working for TranStewart (Filing No. 95 at 5; Filing No. 97-1 at 6–7, 17).

TranStewart specified the date that Lee needed to arrive at its facility for inspection and orientation (Filing No. 95 at 3). TranStewart required Haston to have the truck inspected before it left for Michigan and required that Lee have the inspection documentation with him upon his arrival. *Id.* TranStewart further instructed Haston to ensure Lee brought a valid medical card and doctor's report. *Id.* TranStewart did not exercise any control over the route Lee took to TranStewart's facility (Filing No. 85-1 at 18).

**D.**     **The Letter of Intent and GAAC Policy**

TranStewart provided a "Letter of Intent" for Lee's drive to Michigan.  The letter was dated January 26, 2021,[3] signed by Turpin, and stated:

> Please be aware that Burrell Lee will be hired to work as a driver for TranStewart Trucking Inc. (MC363125) on January 28th, 2021. He will be en route to orientation during January 26th to 29th.

---

[2] It is not clear where exactly Lee began his journey to Michigan, but it is undisputed that Lee traveled north on Interstate 69 to get there.

[3] The Letter of Intent is dated January 26, 2021, appears to mistakenly refer to Lee's anticipated hiring date as "January 28th, 2021" (Filing No. 97-11). It is undisputed that the Letter of Intent was intended to accompany Lee on his drive to Michigan in January 2022 and that Lee's anticipated hiring date was January 28, 2022. The Court corrects the scriveners error to reflect the dates in 2022.

If you have any questions, feel free to contact me direct at [phone number].

(Filing No. 84 at 4; Filing No. 97-11).

The Letter of Intent was intended to explain to law enforcement why the truck did not have a license or placards and provide assurance that the driver was not "attempting to do anything illegal" (Filing No. 84 at 4; Filing No. 95 at 4).

Haston also requested that TranStewart obtain a non-trucking insurance policy for Haston to cover Lee's trip to Michigan (Filing No. 84 at 4; Filing No. 95 at 4). TranStewart obtained the policy from Great American Assurance Company ("GAAC"), which listed Haston as the named insured and had an effective date beginning January 26, 2022 (the "GAAC Policy") (Filing No. 88-4; Filing No. 84 at 4; Filing No. 95 at 4). As its name suggests, a non-trucking insurance policy covers accidents involving a truck not being used for trucking. *See Hartford Ins. Co. of Se. v. Occidental Fire & Cas. Co. of N.C.*, 908 F.2d 235, 239 (7th Cir. 1990). The GAAC Policy specifically excludes coverage for any damages "arising out of any accident which occurs while the covered auto is being used in the business of any lessee or while the covered auto is being used to transport cargo of any type" (Filing No. 88-4 at 15). The GAAC Policy also excludes as an "insured" "[a]nyone engaged in the business of transporting property for hire." *Id.* at 14.

TranStewart was identified as the "Motor Carrier" on the Application for Physical Damage and Non Trucking Liability Insurance for Independent Contractors (Filing No. 97-10). The truck was also given a "Fleet ID" on the Certificate of Insurance, which was the last four digits of the truck's serial number (Filing No. 97-2 at 8–9; Filing No. 97-9).

**E.   The Cherokee Policy**

TranStewart separately obtained an insurance policy from Cherokee, identified as Policy No. CA 210081, with effective dates from May 1, 2021 to May 1, 2022 (the "Cherokee Policy") (Filing No. 87 at 8). TranStewart was the primary insured under the Cherokee Policy.

Under the Cherokee Policy, as amended, "insureds" include "You [TranStewart] for any covered 'auto'"; "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow," with certain exceptions; and "[t]he owner or anyone else from whom you hire or borrow a covered auto that is not a trailer while the covered auto is being used exclusively in the business of transporting property by auto for hire under executed written contract with the Named Insured" ([Filing No. 88-6 at 2](), 5, 7, 49).

The Cherokee Policy provides coverage for certain damages arising from auto accidents and "resulting from the ownership, maintenance or use of a covered 'auto'" ([Filing No. 88-6 at 6]()). The Cherokee Policy does not define "covered 'auto,'" but the "Hired Autos Specified As Covered Autos You Own Endorsement" states that "[a]ny 'auto' described in the Schedule will be considered a covered 'auto' you own and not a covered 'auto' you hire, borrow or lease." *Id.* at 25. The Schedule itself does not contain a description of any auto, but the bottom of the Schedule states "Information required to complete this Schedule, if not shown above, will be shown in the Declarations." *Id.* In the Declaration, the "Schedule of Covered Autos You Own" states "PER SCHEDULE ON FILE WITH COMPANY." *Id.* at 2.

## F.   **The Collision**

On January 28, 2022, while Lee was en route to TranStewart's facility in Michigan he was involved in a collision with the Plaintiffs, who are husband and wife.  At approximately 1:39 a.m., Holder's van became disabled on the right shoulder of northbound Interstate 69 in Madison County, Indiana.  ([Filing No. 84 at 5](); [Filing No. 95 at 5]().)  Ratcliff arrived to help Holder and parked his vehicle just ahead of Holder's minivan but faced his vehicle southbound so his headlights would illuminate the minivan ([Filing No. 84 at 5](); [Filing No. 95 at 6]()). Holder was sitting in her stalled minivan, and Ratcliff was standing in between the vehicles, checking Holder's

minivan (Filing No. 84 at 5). Lee, while driving northbound on Interstate 69, saw Ratcliff's south-facing headlights and mistakenly thought they were from oncoming traffic.  In response, Lee swerved out of the travel lane and onto the shoulder, crashing into the back of Holder's minivan and unfortunately pinning Ratcliff between the two vehicles (Filing No. 84 at 5; Filing No. 95 at 6).  Both Plaintiffs sustained injuries from the crash.

After the collision, the Letter of Intent was presented to responding police officers.  In their Standard Crash Report form, the officers identified Haston as the owner of the truck and TranStewart as the "Carrier" (Filing No. 97-12).  Police notified TranStewart about the collision using the telephone number listed on the Letter of Intent (Filing No. 95 at 6).  Lee spoke with TranStewart about the collision the following day.  *Id.*  Sometime after the collision, Lee procured another truck from Haston and worked as a driver for TranStewart.  *Id.* at 6.

## G.   **Procedural History**

On February 25, 2022, Plaintiffs initiated this action in Indiana state court by filing a complaint against Lee for negligence.  Plaintiffs later amended their complaint to add TranStewart, Cherokee, and GAAC as defendants, alleging vicarious liability and seeking declaratory judgments regarding insurance coverage.  On March 29, 2022, TranStewart removed the action to this Court (Filing No. 1).  Plaintiffs then filed the operative Second Amended Complaint. In December 2022, Plaintiffs stipulated to the dismissal of Lee and GAAC as the parties had reached a settlement (Filing No. 69; Filing No. 70).  On February 28, 2023, TranStewart and Cherokee moved for summary judgment on Plaintiffs' remaining claims against them (Filing No. 83; Filing No. 86).  Cherokee also moved to strike Plaintiffs' surreply in opposition to its summary judgment motion (Filing No. 110).

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

8

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.    DISCUSSION

Plaintiffs initiated this actions seeking to impose vicarious liability on TranStewart for Lee's conduct under Indiana common law and the Federal Motor Carrier Safety Regulations (the "FMCSR") (Filing No. 54 at 2–4).  They also seek a declaratory judgment stating that under the Cherokee Policy, Cherokee must cover any damages for which TranStewart is liable.  *Id.* at 5–6. TranStewart and Cherokee have each moved for summary judgment. TranStewart argues it is not vicariously liable to Plaintiffs because it did not have any type of relationship with Lee that would impose vicarious liability. Cherokee argues Lee was not an insured under the Cherokee Policy, and the semi-tractor Lee was driving was not a "covered auto" under the Cherokee Police. Plaintiff's respond the motions must be denied because there are genuine issues of material fact that preclude summary judgment in this case. Before addressing the summary judgment motions, the Court must first determine the choice of law.

### 1.    Choice of Law

Cherokee argues that Michigan case law and statutes apply to this dispute and must be utilized in interpreting and applying the Commercial Auto Policy at issue, because Michigan is the place of negotiating, entering into, and performing the contract. (Filing No. 87 at 12). Additionally, Michigan is the state in which Transtewart is incorporated and has its principal place of business; and in which Cherokee, similarly, is domiciled and has its principal place of business. *Id*. TranStewart argues that questions of vicarious liability can be decided either under the laws of Indiana, where the collision occurred, or Michigan, where TranStewart is incorporated (Filing No. 84 at 7, n.1).

To determine which state's substantive law should apply, "[a] district court sitting in diversity must apply the choice of law principles of the forum state (in this case Indiana)." *West Bend Mut. Ins. Co. v. Arbor Homes LLC*, 703 F.3d 1092, 1095 (7th Cir. 2013) (citing *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006); *French v. Beatrice Foods Co.*, 854 F.2d 964, 966 (7th Cir.1988)). In tort actions, Indiana courts apply the law of the state in which the tort occurred, unless the two states' laws substantially conflict and the place of the tort has "insignificant contact" with the litigation. *See Rexroad v. Greenwood Motor Lines, Inc.*, 36 N.E.3d 1181, 1183–84 (Ind. Ct. App. 2015); *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987). The tort action here, occurred in Indiana. Neither TranStewart nor Plaintiffs contend that Indiana and Michigan law are substantially different with respect to vicarious liability. And even if those states' laws did differ, Plaintiffs' claims against TranStewart have significant ties to Indiana so the Court will apply Indiana law.

### 2.    TranStewart's Vicarious Liability

"Vicarious liability is 'indirect legal responsibility.' . . . It is a legal fiction by which a court can hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship to the wrongdoer." *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind. 1999) (quoting Black's Law Dictionary 1404 (5th ed. 1979)). "Respondeat superior is the doctrine most often associated with vicarious liability in the tort context. It relies on an employer-employee or principal-agent relationship and generally does not apply to independent contractors." *Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1068 (Ind. 2022). However, courts employ a variety of other legal doctrines to hold parties vicariously liable, including the doctrines of apparent or actual agency. *Bauermeister v. Churchman*, 59 N.E.3d 969, 974 (Ind. Ct. App. 2016); *see Sword*, 714 N.E.2d at 147.

10

TranStewart argues it is not vicariously liable for Lee's conduct because Lee was not its employee, independent contractor, actual agent, apparent agent, or "employee" under the FMCSR. Further, even if Lee were an independent contractor, TranStewart contends it would not be liable for Lee's conduct under common law or the FMCSR (Filing No. 84 at 6–18). Plaintiffs respond only to TranStewart's arguments regarding liability for employees and actual agents. (Filing No. 95 at 10, 18.) The Court will address whether Lee was TranStewart's employee or actual agent before addressing TranStewart's unopposed arguments regarding liability for Lee as an independent contractor, apparent agent, or "employee" under the FMCSR.

     **a.**     **Employee Status**

Under Indiana law, an employer is vicariously liable for an employee's acts committed in the scope of his employment, though the employer is not typically liable for the tortious conduct of an independent contractor. *Yost v. Wabash College*, 3 N.E.3d 509, 519 (Ind. 2014). Plaintiffs contend there are genuine disputes of material fact as to whether Lee was an employee of TranStewart. In support of their contentions, Plaintiffs use Indiana's framework for determining whether an individual is an employee or an independent contractor. TranStewart replies that Lee was neither, so Plaintiffs' analysis is misplaced. TranStewart's point is well-taken. The Court does not presume that Lee must have been either an employee or an independent contractor, but in the interest of fully addressing Plaintiffs' response, the Court will discuss whether Lee was TranStewart's employee using the framework cited by Plaintiffs.

Whether an individual was an employee or independent contractor is generally a question of fact for the factfinder to decide, but if the significant underlying facts are undisputed, then the court may make that decision. *Moberly v. Day*, 757 N.E.2d 1007, 1009 (Ind. 2001). Indiana courts use a multifactor test from the Restatement (Second) of Agency to determine whether an individual is an employee or an independent contractor, including: (i) the extent of the principal's control over

the details of the individual's work; (ii) whether the individual is engaged in a distinct occupation; (iii) whether the occupation is typically done under supervision; (iv) the skill required for the occupation; (v) whether the principal supplies the instrumentalities, tools, and place of work; (vi) the length of employment; (vii) the method of payment; (viii) whether the work is a part of the principal's regular business; (ix) whether the parties believe they are creating an employer-employee relationship; and (x) whether the principal is in business. *Id.* at 1010 (citing *Mortgage Consultants, Inc. v. Mahaney*, 655 N.E.2d 493 (Ind. 1995)). The Court will consider all ten factors, as no single factor is dispositive. *Id.*

"[A]lthough not dispositive, the right to control the manner and means by which the work is to be accomplished is the single most important factor in determining the existence of an employer-employee relationship." *GKN Co. v. Magness*, 744 N.E.2d 397, 403 (Ind. 2001); *see Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941, 943 (7th Cir. 1984) ("The test for determining whether . . . an employer-employee relationship, exists is whether the alleged employer has the right to control the conduct of the alleged employee 'at the time the negligent act occurred.'" (quoting *Gibbs v. Miller*, 283 N.E.2d 592, 595 (Ind. Ct. App. 1972))).

### i.  Extent of Control

"An employee/servant is one 'employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.'" *Walker v. Martin*, 887 N.E.2d 125, 131 (Ind. Ct. App. 2008). "Conversely, an independent contractor generally controls the method and details of his task and is answerable to the principal as to results only." *Id.* (citing *Wishard Mem'l Hosp. v. Kerr*, 846 N.E.2d 1083, 1090 (Ind. Ct. App. 2006). "The 'right to control' refers to the *right* and not to the actual exercise of control in any particular circumstance." *Stone*, 741 F.2d at 943 (emphasis in original) (citing Indiana law).

12

Plaintiffs state that "[b]eing a truck driver is more than just driving a truck," and includes ensuring regular inspections, acquiring insurance, scheduling deliveries, and obtaining paperwork for law enforcement like the Letter of Intent (Filing No. 95 at 12). Plaintiffs thus consider TranStewart's control over all of those responsibilities in analyzing how much control TranStewart could exercise over Lee. The Court does not doubt that a career in truck driving involves more than driving. Nevertheless, the undisputed evidence shows that Lee's only responsibility in this case was driving Haston's truck. The remaining responsibilities (ensuring inspections, acquiring insurance, scheduling deliveries, obtaining a Letter of Intent) fell to either Haston or TranStewart. Lee's "work" for purposes of the Court's analysis is truck driving.

Plaintiffs contend that TranStewart exerted control over Lee by putting Lee in touch with Haston and dictating where and when Lee needed to be for inspection and orientation (Filing No. 95 at 12). TranStewart responds that none of these actions exerted any control over Lee. "Haston was under no obligation to TranStewart to hire Lee as a driver, . . . TranStewart did not require Lee's arrival at a specific time, nor did it suggest or determine Lee's route to its facility" (Filing No. 106 at 4). The Court agrees with TranStewart. Although TranStewart encouraged Lee to contact Haston and offered to lease Haston's truck, TranStewart did not direct Lee or Haston to work with the other, and it did not direct Lee to drive Haston's truck. The undisputed evidence shows that those decisions were entirely up to Lee and Haston. Although TranStewart required Lee to attend orientation as a condition of his working relationship with TranStewart, TranStewart could not control whether Lee attended orientation.

More importantly, TranStewart did not control the method or details of Lee's trip to Michigan, including his departure date or time, his route, his speed, or his stops. It is undisputed that Lee made those decisions and controlled those details. *See Walker*, 887 N.E.2d at 131–32

13

(citing evidence that driver picked his own routes for hauling logs as evidence that company did not control method or means of work). TranStewart at most dictated the results of Lee's trip—*i.e.*, the date Lee must arrive and what he must have with him upon arrival.

The undisputed evidence shows that TranStewart did not exert any control over the method or details of Lee's drive to Michigan. Accordingly, the first and most important factor weighs heavily against employee status.

### ii.  Distinct Occupation

The second factor considers whether the worker is engaged in a distinct business or occupation. *Moberly*, 757 N.E.2d at 1010. Lee worked as a professional truck driver for decades prior to the incident. He worked as a driver for several companies and operated his own driving company for a time (Filing No. 95 at 13; Filing No. 97-1 at 18–22). Plaintiffs argue that because there is no evidence as to whether Lee was working for other trucking companies at the time of the collision, there are genuine disputes of material fact as to whether Lee was engaged in a distinct occupation (Filing No. 95 at 13). The Court is not persuaded. An individual does not need to be working for several employers simultaneously to engage in a distinct occupation. The fact that an individual has provided the same services to multiple employers over time indicates that the individual's occupation is distinct. *Moberly*, 757 N.E.2d at 1011 ("Hendershot worked as a truck driver and heavy equipment operator for a materials company. This is a distinct enough occupation to weigh at least slightly in favor of independent contractor status."). The fact that Lee provided driving services to multiple companies, and at one point formed his own company providing solely those services, indicates that he was engaged in a distinct occupation. *See Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 569 (7th Cir. 2009) (applying Indiana law; stating that trial court found that this factor, and others, weighed against employee status because individual "had the sort of advanced programming skills that allowed him to contract his work out

14

to a number of companies, and even started his own business"). The second factor therefore weighs against employee status.

### iii. **Level of Supervision**

The next factor considers whether the occupation at issue consists of work usually done under an employer's supervision or by a specialist without supervision. *Moberly*, 757 N.E.2d at 1010. Plaintiffs argue that "[i]t is not uncommon for trucking companies to supervise driver's acquisitions and movements of trucks to be added to their fleet like TranStewart did in this case," but this assertion is not supported by any evidence. TranStewart's contrary argument is likewise unsupported by designated evidence. The Court is therefore unable to determine whether this factor weighs in favor of or against employee status.

### iv. **Skill Required**

The fourth factor focuses on the skill required to perform the occupation involved. *Moberly*, 757 N.E.2d at 1010. "Unskilled labor is usually performed by employees, while skilled labor is often performed by independent contractors." *Walker*, 887 N.E.2d at 132. Plaintiffs acknowledge that operating a commercial motor vehicle requires special skill and training. Lee held a commercial driver's license and drove commercial motor vehicles professionally for decades prior to the collision. Commercial truck driving certainly requires skill. This factor weighs against employee status. *Walker*, 887 N.E.2d at 132 (describing regulations that commercial truck drivers must be familiar with and comply with).

Plaintiffs contend that this factor should be given limited weight because "[i]t was TranStewart's skills and relationships that put Lee on the road at the time of the crash" (Filing No. 95 at 15). However, the skill at issue is the skill required to drive a commercial motor vehicle, not source one for a driver. TranStewart's skill in sourcing Haston's vehicle is therefore immaterial.

### v.  Instrumentalities

The fifth factor considers whether the principal provides the tools or instrumentalities of the individual's work. *Moberly*, 757 N.E.2d at 1012. Plaintiffs argue this factor "is not particularly meaningful in this situation because neither TranStewart nor Lee owned the semi tractor involved in the collision" (Filing No. 95 at 15). The Court disagrees. The fact that TranStewart did not provide the truck, or pay for gas or fees associated with the truck's maintenance, weighs against employee status. That weight is countered slightly by the fact that TranStewart took steps to put Lee in touch with Haston, who ultimately supplied the truck, even though Haston's decision to hire Lee was his own. Overall, the fifth factor weighs against employee status, though only moderately.

### vi.  Length of Employment

A long-term employment relationship can indicate employee status. *Moberly*, 757 N.E.2d at 1012 (citing Restatement (Second) of Agency § 220(2)). "Additionally, an employee is '"one who performs continuous service for another."'" *Walker*, 887 N.E.2d at 133 (quoting *Moberly*, 757 N.E.2d at 1012 (quoting Restatement (Second) of Agency § 220(2))). Plaintiffs assert that "Lee had worked as a driver for TranStewart twice prior to the collision, for a total of almost two years," so he maintained a long-term employment relationship with TranStewart (Filing No. 95 at 16). However, Lee did not work for TranStewart for two continuous years. He worked two nine to ten-month periods, with a year in between, over the course of two and a half years. *Id.* at 2. Even assuming Lee worked regular hours during those periods (which is not supported by designated evidence) Lee's work history with TranStewart does not evidence the type of long-term, continuous relationship indicative of an employment relationship. *See Walker*, 887 N.E.2d at 133 (finding no regular, continuous employment where log hauling driver worked for defendant "on and off" for around three and a half years, hauled logs for other employers despite working

primarily for defendant, and "was free to haul logs for any other party as he wished"). This factor weighs against employee status.

### vii. Method of Payment

"Sporadic payments in lump sum amounts for each job performed, instead of payments by the hour or on a weekly basis are more typical of an independent contractor than an employee." *Walker*, 887 N.E.2d at 133. The undisputed evidence shows that Lee was not paid at all by TranStewart for his trip to Michigan, and that Lee would not have been paid directly by TranStewart even if hired. Because TranStewart did not pay Lee at all, much less on a regular basis, this factor therefore weighs against employee status.

### viii.  Principal's Regular Business

The eighth factor considers whether or not the work at issue is part of the employer's regular business. *Moberly*, 757 N.E.2d at 1010.  Lee was a truck driver, and TranStewart was in the regular business of providing trucking services.  This factor thus weighs in favor of employee status.

### ix.  Parties' Beliefs

The ninth factor asks whether the parties believed they were creating an employer-employee relationship. *Moberly*, 757 N.E.2d at 1010. "'It is not determinative that the parties believe or disbelieve that the relation of master and servant exists, except insofar as such belief indicates an assumption of control by the one and submission to control by the other.'" *Id.* at 1012–13 (emphasis added) (quoting Restatement (Second) of Agency § 220(2), cmt. m). TranStewart and Lee each attest that they did not believe they had created an employment relationship at the time of the collision (Filing No. 106 at 10–11; Filing No. 95 at 17).  Moreover, Lee's deposition testimony confirms that even during the periods he was driving for TranStewart, he never considered himself an employee and always considered himself a contractor (Filing No. 97-1 at 7).

Plaintiffs argue that some of TranStewart's actions show that it believed Lee was an employee, like listing itself as the motor carrier and assigning Haston's truck a fleet number on the GAAC Policy, and by providing the Letter of Intent stating that TranStewart was going to hire Lee on the day of the collision (Filing No. 95 at 17). These actions might indicate that TranStewart believed it had some type of relationship with Lee, but they do not contradict TranStewart's assertions that Lee was not an employee. These actions could be entirely consistent with an employer-independent contractor relationship.

Since neither TranStewart nor Lee believed Lee was an employee at the time of the collision, this factor weighs against employee status.

### x.  Whether Principal is in Business

If the principal is in business, then this factor weighs in favor of employee status.  *Moberly*, 757 N.E.2d at 1013.  It is undisputed that TranStewart is still in business, so the final factor favors employee status.

### xi.  Consideration of All Factors

The leading factor of control weighs against employee status, and six of the three remaining factors also weigh against employee status. Only the eighth and tenth factors (the principal's regular business and whether the principal is in business) weigh in favor of employee status.  There is insufficient evidence to determine how to weigh the third factor (level of supervision), but even if the undisputed evidence had shown that Lee typically performed his work under supervision, that evidence would not tip the scales in favor of employee status.  The significant underlying facts are undisputed, and the Court thus may decide whether Lee was an employee as a matter of law. *Moberly*, 757 N.E.2d at 1009.

When considering all ten factors and drawing all reasonable inferences in Plaintiffs' favor, the undisputed material facts show that Lee was not an employee at the time of the collision.

18

TranStewart is thus not vicariously liable for Lee's conduct as his employer. *See, e.g.*, *Damiani v. Allen*, No. 16-cv-53, 2018 WL 4095080, at *23 (S.D. Ind. Aug. 28, 2018) (granting summary judgment in favor of principal; finding no agency relationship because "[e]ven when viewing the evidence in the light most favorable to Plaintiff, [principal] only has a small measure of control, which is insufficient to find an agency relationship under Indiana law"); *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 164–65 (Ind. 2014) (granting summary judgment in favor of principal; holding purported principal lacked sufficient control to establish agency relationship).

### b.    Actual Agent Status

TranStewart also contends that Lee was not its actual agent. *Clark v. State*, 209 N.E.3d 444, 448 (Ind. Ct. App. 2023) ("An agency relationship may be actual, implied, or apparent." (citing *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210–11 (Ind. 2000))). "Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former." *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind. Ct. App. 2002). "To establish an actual agency relationship, three elements must be shown: (1) manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent." *Bauermeister*, 59 N.E.3d at 974 (citing *Demming v. Underwood*, 943 N.E.2d 878, 884 (Ind. Ct. App. 2011), *trans. denied*). "Whether an agency relationship exists is generally a question of fact, but if the evidence is undisputed, summary judgment may be appropriate." *Bauermeister*, 59 N.E.3d at 974.

Like with Indiana's test for employee status, the right to control an agent's work is the most important element in determining whether an agency relationship exists. *See Steak N Shake Operations, Inc. v. Nat'l Waste Assocs., LLC*, 177 N.E.3d 816, 829 (Ind. Ct. App. 2021) ("The 'true test' in determining whether an agency relationship exists is 'how much control the [alleged] principal has over the alleged agent . . . .'" (quoting *Dutton v. Int'l Harvester Co.*, 504 N.E.2d 313,

317 n.2 (Ind. Ct. App. 1987), *trans. denied* (finding no agency relationship existed because alleged principal did not reserve right to control means and methods of alleged agent's performance of contractual obligations)). "To satisfy the control element, it is necessary that the agent be subject to the control of the principal with respect to the details of the work." *Aspen Am. Ins. Co. v. Blackbaud, Inc.*, 624 F. Supp. 3d 982, 1003 (N.D. Ind. 2022) (citing *Bunger v. Demming*, 40 N.E.3d 887, 893 (Ind. Ct. App. 2015)); *see Smith*, 9 N.E.3d at 164 ("'[The] right to control' does not require the [principal] actually exercising control over the actions of the agents, but merely having the right to do so"; holding principal's ability to impose post-conduct sanctions on purported agent does not establish right to control for purposes of establishing agency).

As to the first element, TranStewart argues it never manifested its consent that Lee act as its agent, as TranStewart had not yet signed a lease for Haston's truck and had expressly conditioned a lease upon completion of an inspection and orientation (Filing No. 84 at 11–12). In response, Plaintiffs argue TranStewart manifested its consent by instructing Lee to drive the truck to TranStewart's facility, by procuring the GAAC Policy, and by providing the Letter of Intent (Filing No. 95 at 19). TranStewart replies that none of this evidence shows a manifestation of TranStewart's consent, and the Court agrees.

TranStewart did not manifest its consent that Lee act as its agent during the drive to Michigan by putting Lee in touch with Haston. These actions might have manifested consent to have Lee act as an agent once he arrived in Michigan and completed orientation, but not sooner. The GAAC Policy and Letter of Intent likewise did not manifest TranStewart's consent that Lee act as its agent before Lee reached Michigan. Both documents indicate the opposite. The GAAC Policy applies only to auto accidents occurring *outside* the scope of TranStewart's trucking business. And the Letter of Intent expressly states that Lee was driving to Michigan in order to be

hired by TranStewart upon his arrival, negating any implication that TranStewart consented to Lee acting as an agent before then.

As to the second element, TranStewart argues that Lee knew he would not be approved to work for TranStewart until he completed orientation and therefore never manifested his acceptance of TranStewart's authority. *Id.* at 12. Plaintiffs respond that Lee's primary purpose in driving the truck was to deliver it to TranStewart for TranStewart's benefit, so he was clearly manifesting an intent to act on TranStewart's behalf. However, Lee stated in his deposition that he was driving Haston's truck to Michigan "for [his] own benefit in order to get to Michigan and get hired by TranStewart" (Filing No. 85-3 at 10). Lee also repeatedly testified that he did not believe he was TranStewart's employee at the time of the collision and that he was not acting under TranStewart's "direction, control, or dispatch." *Id.*

As to the final element of actual agency, TranStewart contends it did not exert any control over Lee at the time of the collision (Filing No. 84 at 13). Plaintiffs argue that TranStewart exercised control by specifying the date and location of orientation, by requiring that the truck be inspected before departing for Michigan, by requiring that Lee bring certain documents with him to orientation, and by providing the GAAC Policy and Letter of Intent (Filing No. 95 at 20). The Court again disagrees with Plaintiffs. As discussed above, TranStewart did not exercise control over Lee by merely specifying where and when Lee needed to arrive. Whether Lee decided to arrive, and the details of how he arrived, were up to Lee. Though TranStewart required that the truck be inspected before traveling to Michigan and that the inspection paperwork accompany Lee to Michigan, TranStewart imposed those requirements on Haston, not Lee (Filing No. 97-8 at 5–6). Moreover, TranStewart did not exert any control over Lee's driving by requiring that the truck be inspected or that Lee bring certain documentation with him.

TranStewart also did not exercise control over Lee's trip to Michigan by providing the GAAC Policy or Letter of Intent. The GAAC Policy merely insured Lee's trip there, and the Letter of Intent explained the purpose of the trip. Plaintiffs have failed to create a genuine dispute of material fact as to any of the three elements of actual agency, and the undisputed material facts show that Lee was not acting as TranStewart's actual agent at the time of the collision.

There appears to be no factually analogous case from Indiana or within the Seventh Circuit discussing vicarious liability, but similar cases from other states and circuits are persuasive. The most recent analogous case is *Weeks v. Sands*, No. 20-2709, 2021 WL 5828043 (W.D. Tenn. Dec. 8, 2021). In *Weeks*, defendant Davarious Sands ("Sands") applied to be a truck driver for defendant Western Flyer Express ("WFX") after a WFX employee encouraged Sands to apply. *Id.* at *1. The day after applying, WFX sent Sands an email inviting him to attend orientation. Another email confirmed the invitation and stated "Welcome to the WFX family." Sands was also told that he should bring enough clothing and bedding for two to three weeks "on the road." *Id.* At WFX's orientation, prospective drivers must pass a drug and alcohol test, a practical road test, and a practical examination. They receive meals and lodging throughout orientation, and if they successfully complete orientation, then they are officially offered employment. *Id.* WFX would typically pay for a rental car for applicants and select the class of vehicle to be provided. *Id.* Sands picked up his rental vehicle on July 12, 2019, and headed to orientation the next day. On his way, Sands' vehicle collided with the plaintiffs' vehicle. Sands attended orientation a few days later but was not hired due to the collision. WFX paid for Sands' bus ticket home. *Id.* at *4.

The *Weeks* plaintiffs, like Plaintiffs here, sued WFX under a theory of vicarious liability. *Id.* at *2. WFX sought summary judgment, arguing in part that WFX was neither liable as Sands' employer nor as his principal. The district court agreed with WFX on both counts. The court held

that the evidence did not "demonstrate the 'right to control the means and manner of performance' that Tennessee courts and the Sixth Circuit view as essential to the employer-employee relationship." *Id.* at 4. In support of this conclusion, the court cited the fact that WFX required prospective drivers to pass drug tests and examinations before hiring them, that Sands did not receive unemployment benefits upon being sent home, that he was not paid or reimbursed for expenses other than his bus ticket home, and that he "was not told where to eat or where to stop along the way" to orientation. *Id.*

The evidence was also insufficient to demonstrate an agency relationship. The plaintiffs argued that "Sands acted as WFX's agent by participating in its orientation, and through implication, by traveling there," but the court disagreed. *Id.* \*5. The *Weeks* court focused on the lack of control WFX had over Sands:

> At the time of the accident, WFX exercised no actual control over Sands; the company only told him to show up at the orientation by a certain date and time. WFX did not control Sands's conduct on the drive, what route he took, where he stopped, or where he slept along the way. Sands could have refused to go or could have used a different car without any repercussions. While WFX received a benefit from hiring new drivers, it did not necessarily receive a benefit merely from Sands's attendance.

*Id.* The facts of *Weeks* are very similar to the facts of this case, and like the *Weeks* court, this Court concludes that TranStewart did not exercise sufficient control over Lee to create an employment or actual agency relationship.

At least three other state courts reached the same conclusion in similar cases. In *Wilken v. Van Sickle*, 507 P.2d 1150 (Or. 1973), a vehicle driven by defendant Van Sickle ("Van Sickle") collided with the plaintiff's vehicle. *Id.* at 1151. Plaintiff sued Van Sickle and defendant Freightliner Corporation ("Freightliner"), arguing that Van Sickle was Freightliner's agent at the time of the collision. Van Sickle had applied for a job with Freightliner the day before the collision. He had completed the necessary onboarding paperwork and was to be hired once he passed a

medical examination. *Id.* Van Sickle attended and completed the medical examination and was instructed to return his examination paperwork to Freightliner's office. However, instead of returning directly to Freightliner's office, Van Sickle stopped at his girlfriend's home. After leaving his girlfriend's home and on the way to Freightliner's office, Van Sickle collided with the plaintiff's vehicle. *Id.*

The Oregon Supreme Court concluded that "[c]learly, at the time of the accident, [Van Sickle] was not an employee of defendant Freightliner." *Id.* In particular, the court noted that "[t]here was no showing that Freightliner had the right to exercise some degree of control over Van Sickle at the time. How and when he returned the medical papers to Freightliner's office was entirely within Van Sickle's discretion." *Id.* Freightliner "had no right to control the physical movements of Van Sickle in going to or returning from the clinic. Van Sickle was under no obligation to take the physical examination or to return to the Freightliner offices afterward." *Id.* at 1152. A similar lack of control shows that Lee was not acting as TranStewart's employee or agent during his drive to TranStewart's facility.

In *McLean v. St. Regis Paper Co.*, 496 P.2d 571 (Wash. Ct. App. 1972), the plaintiff filed suit against defendant St. Regis Paper Company ("St. Regis") after being struck by co-defendant Alan Roland's ("Roland") vehicle. On Friday, August 18, 1967, Roland interviewed for a position with St. Regis. Although Roland was not officially hired that day, he believed he had the job. Before beginning work, though, Roland needed to undergo a physical examination paid for by St. Regis. Roland was instructed to return to St. Regis's office the following Monday, pick up the examination form, travel to a clinic for the examination, and then return the completed form to St. Regis's office. On Monday morning, a receptionist from St. Regis told Roland where the clinic

was but not how to get there. Roland borrowed his friend's car and headed to the clinic. On the way, Roland collided with the plaintiffs. *Id.* at 572.

The Washington Court of Appeals concluded that St. Regis did not exercise sufficient control over Roland to warrant vicarious liability. "Roland was told only where [the clinic] was, not how to get there. He provided his own transportation and was in every sense on his own. He was under no obligation to actually take the physical examination, nor to return to St. Regis afterward." *Id.* at 754. The *McLean* plaintiffs, like Plaintiffs here, argued that St. Regis should be held liable because it "set in motion the chain of events leading to the tragic injuries . . . and indeed was to receive a benefit from the undertaking." *Id.* at 575. The court rejected that argument, holding that "[t]he law, to this time at least, has limited the extent of vicarious liability to those who have some ability to control its consequences*." Id.* In *McLean*, St. Regis had no ability to control the consequences of Roland's driving, and here, TranStewart had no ability to control the consequences of Lee's driving.

And lastly, in *Lallatin v. Terry*, 340 P.2d 112 (Idaho 1959), *overruled on other grounds by Schaub v. Linehan*, 442 P.2d 742 (Idaho 1968), the action arose from an accident while a defendant was en route to a new job. The decedent was plowing snow from the highway when his plow struck a car stalled in the snow. The decedent got out of his truck and began walking toward the stalled car, when he was struck and killed by defendant Jay Terry ("Terry"). *Id.* at 114. Terry listed defendant Dyke's Pole Line Electric ("Dyke's") as his employer on his hospital forms. The decedent's family sued Terry and Dyke's for wrongful death.

Prior to the collision, Terry had been asked and agreed to accept employment by Dyke's in Soda Springs, Idaho. The morning of the collision, Terry left his home in his own car to report for his first day of work. *Id.* at 116. The Idaho Supreme Court concluded that "[a]t the time of the

25

accident, Terry was neither an agent, employee nor servant of Dyke's." *Id.* at 116–17. Even "[a]ssuming that an obligation on the part of Dyke's arose out of his driving toward Soda Springs in an effort to report for work, the record is conclusive that Dyke's had no control or right of control of the means or manner of transportation. The use and operation of his automobile in that effort was entirely his choice, and under his complete control." *Id.*

Other federal and state courts have also held that an employer does not sufficiently control the details of a prospective employee's work by establishing conditions of prospective employment, and thus does not create an employer-employee relationship for purposes of wage and hours laws and worker's compensation. *See, e.g.*, *Brum v. MarketSource, Inc.*, No. 17-CV-241, 2017 WL 4883376 (E.D. Cal. Oct. 27, 2017) (finding that prospective employer who picks time, date, location, and scope of drug test that is a prerequisite for employment does not exert sufficient control over prospective employee to establish employment relationship); *Stoker v. Furr's, Inc.*, 813 S.W.2d 719, 722–23 (Tex. Ct. App. 1991) (finding that employer had no "right to control" details of plaintiff's work, "as opposed to the end results," until plaintiff "had been put on the payroll and commenced work," despite accepting job offer several days earlier).

The Court's analysis under Indiana law is consistent with these other courts' conclusions. For all of the above reasons, the Court concludes that Lee was neither an employee nor an actual agent of TranStewart at the time of the collision, and TranStewart is not vicariously liable.

### c. Independent Contractor, Apparent Agent, or Federal Motor Carrier Safety Regulations (FMCSR) "Employee" Status

TranStewart additionally argues that it is not vicariously liable for Lee's negligence under common law or the FMCSR because Lee was not its independent contractor, apparent agent, or "employee" as defined in the FMCSR at the time of the collision. Plaintiffs' response brief does not address any of these arguments, and Plaintiffs therefore have conceded these points. *See Bonte*

*v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession); *Myers v. Thoman*, No. 09-cv-0544, 2010 WL 3944654, at *4 (S.D. Ind. Oct. 6, 2010) ("The Seventh Circuit has clearly held that a party who fails to respond to points made . . . concedes those points."); *Cintora v. Downey*, No. 08-cv-2298, 2010 WL 786014, at *4 (C.D. Ill. Mar. 4, 2010) ("The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession."); *Sequel Capital, LLC v. Pearson*, No. 07-CV-2642, 2010 WL 4008161, at *7–8 (N.D. Ill. Oct. 12, 2010) (same); *Thomas v. Am. Family Mut. Ins. Co.*, No. 07 cv 162, 2008 WL 4911192, at *5 (N.D. Ind. Nov. 13, 2008) (same).

But even if Plaintiffs had not conceded, the undisputed evidence shows that TranStewart is not vicariously liable for Lee's negligence under an independent contractor theory, apparent agent theory, or under the FMCSR.

### i. **Independent Contractor**

The Court need not address whether Lee was an independent contractor, because even if he were, TranStewart would not be vicariously liable for his conduct. In Indiana, "the long-standing general rule has been that a principal is not liable for the negligence of an independent contractor." *Bagley v. Insight Comms. Co.*, 658 N.E.2d 584, 586 (Ind. 1995). Indiana courts recognize five common-law exceptions to this general rule: (1) the contract requires the performance of intrinsically dangerous work; (2) the principal is charged by law or by contract to perform the specific duty; (3) the act will create a nuisance; (4) the act will probably cause injury to others unless due precaution is taken; and (5) the act is illegal. *Bagley*, 658 N.E.2d at 586. For the reasons argued by TranStewart, none of these exceptions apply (Filing No. 15–16).

## ii. **Apparent Agent**

Indiana courts have imposed vicarious liability on principals for the acts of their apparent agents, including independent contractors acting as apparent agents. "Apparent agency may be established when a third party reasonably believes there is a principal-agent relationship based on the principal's manifestations to the third party." *Arrendale*, 183 N.E.3d at 1068. *Clark*, 209 N.E.3d at 448 ("[A]pparent agency does not depend on the principal's express or implied authorization for the agent to act on the principal's behalf; rather, apparent agency exists when 'a principal's manifestations induce a third party to reasonably believe there is a principal-relationship.'" (quoting *Arrendale*, 183 N.E.3d at 1068) (citing *Pepkowski v. Life of Ind. Ins. Co.*, 535 N.E.2d 1164, 1167 (Ind. 1989))).

TranStewart did not make any manifestations that would cause a third party to reasonably believe that Lee was acting as its agent. The truck Lee was driving did not have any TranStewart placards or markings (Filing No. 85-2 at 17; Filing No. 97-1 at 16). And although the GAAC Policy and Letter of Intent evidence some type of relationship between TranStewart and Lee, both documents negate the implication that Lee was driving to Michigan as part of TranStewart's business or as TranStewart's agent.

Moreover, it is unclear whether TranStewart could even be held vicariously liable in tort under an apparent agency theory. To date, the Indiana Supreme Court has imposed such liability only on medical facilities. *Sword*, 714 N.E.2d at 147 (extending vicarious liability to negligence by apparent agents of hospitals); *Arrendale*, 183 N.E.3d at 1070 (extending *Sword* liability to non-hospital medical facilities); *see also Webster v. CDI Ind., LLC*, 917 F.3d 574, 577–78 (7th Cir. 2019) (applying Indiana law in holding MRI facility vicariously liable for negligence of apparent agents). *But see Pfadt v. Wheels Assured Delivery Sys., Inc.*, 200 N.E.3d 961 (Ind. Ct. App. 2022) (extending *Sword* liability to negligence by apparent agent of delivery company). Regardless,

because Lee was not TranStewart's apparent agent, TranStewart is not liable under an apparent agency theory.

### iii. <u>Federal Motor Carrier Safety Regulations (FMCSR) "Employee"</u>

The FMCSR imposes vicarious liability on motor carriers for the negligence of "employees," which is defined by regulation to include both employees and independent contractors. 49 C.F.R. § 390.5. "The FMCSR eliminate the distinction between independent contractors and employees so that an attempt by motor carriers to avoid liability simply by labeling a driver as an independent contractor is unavailing." *Ill. Bulk Carrier, Inc. v. Jackson*, 908 N.E.2d 248, 255 (Ind. Ct. App. 2009). For vicarious liability under the FMCSR to attach to a motor carrier, that motor carrier must have been in control or possession of the motor vehicle at issue. *See id.* The undisputed evidence shows that TranStewart never possessed or controlled Haston's truck.[4]

In sum, the undisputed material facts show that TranStewart and Lee did not have any type of relationship that would impose vicarious liability on TranStewart. TranStewart has shown that Lee was not its employee or actual agent under Indiana law. Plaintiffs have also failed to rebut TranStewart's arguments that it is not vicariously liable under an independent contractor theory, apparent agency theory, or under the FMCSR. Accordingly, TranStewart is entitled to judgment as a matter of law, and TranStewart's Motion for Summary Judgment is **granted**.

### H. <u>Cherokee's Motion to Strike Surreply</u>

Before deciding Cherokee's Motion for Summary Judgment, the Court must resolve Cherokee's Motion to Strike Plaintiffs' Surreply. The "purpose for having a motion, response, and

---

[4] TranStewart also argues that vicarious liability under the FMCSR only attaches to motor carriers operating under a lease, and TranStewart did not execute a lease before the collision (Filing No. 106 at 2, n.1). TranStewart raises this argument for the first time in its reply, so the Court treats it as waived and will not consider it. *O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) (stating that the Seventh Circuit has "repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived").

reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, No. 09-cv-340, 2010 WL 1258052 (S.D. Ind. Mar. 25, 2010). "New arguments and evidence may not be raised for the first time in a reply brief. Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief." *Reis v. Robbins*, No. 14-cv-63, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015) (citations omitted). "Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response." *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019).

Federal Rule of Civil Procedure 12(f) allows the Court to "strike from a pleading an insufficient defense or redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally disfavored; however, "where . . . motions to strike remove unnecessary clutter from the case, they serve to expedite, not delay." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

The primary dispute in the Motion to Strike is whether evidence attached to Cherokee's Reply is "new evidence" that warrants a surreply. In Cherokee's Reply in Support of its Motion for Summary Judgment (the "Reply"), Cherokee challenged the evidentiary basis for several statements of material fact made in Plaintiffs' response (Filing No. 105 at 6–9). Cherokee attached nine exhibits to its Reply, totaling ninety-six pages. Plaintiffs filed a surreply (the "Surreply") to address the "new facts" cited in the Reply, which also attached evidence (Filing No. 109). Then Cherokee filed its Motion to Strike Plaintiffs' Surreply, Plaintiffs filed their response to the Motion to Strike, and Cherokee filed a reply, which thankfully concluded briefing.

Cherokee argues that its Reply did not present "new evidence" because it did not cite any evidence "not previously cited by Cherokee, Plaintiffs, or TranStewart, or that Plaintiffs did not already have possession/knowledge of, since Plaintiffs noticed and took each of the depositions relied on by the parties as cited above" (Filing No. 110 at 9). In response, Plaintiffs contend that the Reply cites several new pages of deposition testimony not previously designated by Cherokee or Plaintiffs and that they should be given an opportunity to surreply in the interest of fairness (Filing No. 111 at 1–2). The Court agrees with Plaintiffs.

Under Federal Rule of Civil Procedure 56, Cherokee is required to support its request for summary judgment by "citing to particular parts of materials in the record." Fed. R. Civ. Pro. 56(c)(1)(A). It is incumbent on Cherokee to identify the evidence it is offering to support its motion so that Plaintiffs can appropriately and fully respond. *See Pike v. Caldera*, 188 F.R.D. 519, 531 (S.D. Ind. 1999) ("[A]fter the nonmovant's response is filed, the issues should be fully framed—the 'world' of evidence should be set; after that point, no new lines of attack or defense are permitted . . . ."). Plaintiffs are not required to assume that Cherokee might use any and all evidence that Plaintiffs have "possession/knowledge of," nor are Plaintiffs required to assume that Cherokee is relying on all of the evidence cited in support of TranStewart's motion simply because TranStewart is a co-defendant. If Cherokee wished to incorporate TranStewart's designated evidence, then Cherokee should have stated as much.

Cherokee created additional confusion by deciding to re-attach exhibits to its Reply instead of citing to the record. By attaching exhibits, Cherokee made it difficult for Plaintiffs, and the Court, to determine whether, where, and by whom the newly attached pages had been cited before. Cherokee only produced these details when moving to strike the Surreply.

The Court is also unpersuaded by Cherokee's argument that the Surreply should be stricken because the "alleged 'new evidence' is immaterial to the overall issues regarding [vicarious liability]" (Filing No. 110 at 9). However, Cherokee did not designate any "immaterial" facts in its opening brief or Reply, and Plaintiffs should not be deprived of an opportunity to respond to new evidence simply because Cherokee now asserts that evidence immaterial. If Cherokee believed the "new evidence" was immaterial, then Cherokee should not have designated it. *See Pike at* 531 (S.D. Ind. 1999).

Cherokee invited a Surreply by filing nearly one hundred pages of exhibits to its Reply, without clarifying whether those exhibits had previously been designated, and by citing to evidence not previously designated by Cherokee or by Plaintiffs in response to Cherokee's motion. In the interest of fairness, Plaintiffs should be given an opportunity to respond.  However, Plaintiffs were not permitted to attach new filings to their Surreply any more than Cherokee was. The Court therefore **grants in part and denies in part** Cherokee's Motion to Strike. The Motion to Strike is **denied** as to Plaintiffs' Surreply, but it is **granted** as to any exhibits to the Surreply.

## I.    <u>Cherokee's Motion for Summary Judgment</u>

Plaintiffs seek a declaratory judgment stating that Cherokee is obligated under the Cherokee Policy to pay any damages that TranStewart owes Plaintiffs. Cherokee argues that its Policy does not provide coverage related to the collision between Lee and Plaintiffs because Lee is not an "insured," and Haston's truck is not a "covered auto" under the Policy (Filing No. 87 at 5). In their response, Plaintiffs do not dispute that Lee is not an "insured." Instead, they argue that Cherokee is obligated to indemnify TranStewart for its vicarious liability, and that genuine disputes of material fact preclude summary judgment as to TranStewart's vicarious liability (Filing No. 99 at 8–9). Plaintiffs also argue that Haston's truck was a "covered auto" under the Policy.

Cherokee and Plaintiffs appear to agree that the issue of TranStewart's vicarious liability is dispositive of Plaintiffs' declaratory judgment claim. Plaintiffs concede that TranStewart is the only insured under the Cherokee Policy and that Lee is not an insured. (Filing No. 99 at 9 ("TranStewart is the named insured on the Cherokee Policy.")); *see Bonte*, 624 F.3d at 466; *Myers*, 2010 WL 3944654, at *4. Thus, if TranStewart is not vicariously liable for Plaintiffs' damages, then there would be no "sums [TranStewart] legally must pay as damages" to be covered under the Cherokee Policy (Filing No. 99 at 9 ("If the jury [holds TranStewart vicariously liable], Cherokee will be obligated to indemnify TranStewart in the amount of the judgment entered because TranStewart is an insured . . . ."). The Court therefore need only resolve the question of vicarious liability to resolve Cherokee's Motion for Summary Judgment.[5]

Plaintiffs incorporate by reference the vicarious liability arguments raised in their response to TranStewart's motion. For the reasons discussed above, those arguments are unavailing. The additional arguments raised in Plaintiffs' Surreply were largely raised in Plaintiff's response to TranStewart's summary judgment motion and, in any event, fail to raise a genuine dispute of material fact or persuade the Court to reach a different conclusion on vicarious liability.

In their Surreply, Plaintiffs first highlight the fact that TranStewart provided Lee with Haston's contact information and "encouraged" Lee to contact Haston. But "[r]egardless of whether the term 'suggested,' requested,' or 'directed' is used" (Filing No. 109 at 3), the fact remains that Lee could have declined to contact Haston without consequence, albeit at the expense of a potential job opportunity. TranStewart did not exercise control over Lee by putting him in touch with Haston.

---

[5] In its Motion for Summary Judgment, Cherokee argues that Michigan law should apply to the Court's interpretation of the Cherokee Policy (Filing No. 87 at 12), but the choice of law issue is not implicated given the limited scope of the Court's analysis.

Plaintiffs next note that TranStewart required that Lee drive Haston's truck to Michigan on a specific date before signing the lease, and TranStewart required that Haston's truck be inspected before departing for Michigan. *Id.* at 3–5. But as previously discussed, TranStewart did not exercise control over Lee's driving by placing conditions on Haston regarding his truck, or by setting conditions of prospective employment. As Plaintiffs state in their Surreply, "TranStewart did not force Lee to drive the semi tractor to Michigan," and Lee could have chosen not to drive to Michigan. *Id.* at 3.

Plaintiffs lastly note that TranStewart obtained and paid for the GAAC Policy for Lee's trip to Michigan, but the GAAC Policy's express terms show that Lee was not driving to Michigan as part of TranStewart's business.

TranStewart is not vicariously liable to Plaintiffs for Lee's negligence and owes Plaintiffs no damages. As such, there are no "sums [TranStewart] must pay as damages" under the Cherokee Policy, so Cherokee is not liable to Plaintiffs for any damages. In other words, the Court's decision on TranStewart's Motion for Summary Judgment has eliminated any actual controversy between Plaintiffs and Cherokee, and Cherokee is entitled to judgment as a matter of law.

Because the vicarious liability issue is dispositive of Plaintiffs' claim against Cherokee, the Court need not and will not address the remaining issue of whether Haston's truck was a "covered 'auto'" under the Cherokee Policy.

Cherokee's Motion for Summary Judgment is **granted**.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, The Court **GRANTS** Defendant TranStewart Trucking Inc.'s Motion for Summary Judgment (<u>Filing No. 83</u>) and Defendant Cherokee Insurance Company's Motion for Summary Judgment (<u>Filing No. 86</u>). The Court also **GRANTS in part and DENIES**

**in part** Cherokee's Motion to Strike Plaintiffs' Surreply (Filing No. 110). The exhibits attached to Plaintiffs' Surreply (Filing No. 109-1; Filing No. 109-2; Filing No. 109-3; Filing No. 109-4; Filing No. 109-5; Filing No. 109-6; Filing No. 109-7) are **STRICKEN**.

    Plaintiffs Gregg Ratcliff and Porsche Holder's claims against TranStewart and Cherokee are **DISMISSED**.  Final judgment will issue under separate order.

    **SO ORDERED**.

Date:   7/31/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Christopher M. Barry
CRAIG KELLEY & FAULTLESS
cbarry@ckflaw.com

Whitney Lee Coker
CRAIG KELLEY & FAULTLESS
wcoker@ckflaw.com

Alexander Ryan Craig
CRAIG, KELLEY & FAULTLESS LLC
acraig@ckflaw.com

David W. Craig
CRAIG KELLEY AND FAULTLESS
dcraig@ckflaw.com

Scott Anthony Faultless
CRAIG, KELLEY & FAULTLESS
sfaultless@ckflaw.com

Samantha C. Craig Stevens
CRAIG, KELLEY & FAULTLESS LLC
scraig@ckflaw.com

William J. Kelley
CRAIG, KELLEY & FAULTLESS
bjkelley@ckflaw.com

Michael Dean Heavilon
DEFUR VORAN
mheavilon@defur.com

Robert D. Emmerson
DEFUR VORAN
remmerson@defur.com

Christopher D. Lee
DINSMORE & SHOHL
Christopher.Lee@Dinsmore.com

Dane Andrew Mize
SKILES DETRUDE
dmize@skilesdetrude.com

Haley Baldwin
WILSON GROUP LAW
hbaldwinwglplc.com

James D Wilson
WILSON GROUP LAW PLC
jwilson@wglplc.com